Vinay V. Joshi (Calif. Bar No. 213487)
vjoshi@thepatentattorneys.com
Anthony S. Kim (Calif. Bar No. 225703)
akim@thepatentattorneys.com
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose, CA 95113
Telephone: (650) 618-6481
Facsimile:  (216) 696-8731

Counsel for Defendants
ASUS Computer International and
ASUSTeK Computer Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| HYBRID AUDIO, LLC | Case No. 3:17-cv-05947-JD |
|         Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
|     v. | |
| ASUS COMPUTER INTERNATIONAL AND ASUSTeK COMPUTER INC., | **DEMAND FOR JURY TRIAL** |
|         Defendants. | Date:  February 8, 2018<br>Time:  10:00<br>Courtroom:11<br>Judge: Hon. James Donato |

- 1 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 8, 2018 at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable James Donato at the United States District Court for the Northern District of California, San Francisco Division, located at Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Asus Computer International and ASUSTeK Computer, Inc. (collectively, "Asus") will and hereby move this Court for an Order dismissing the Complaint (Dkt. No. 1) filed by Hybrid Audio, LLC ("Hybrid Audio") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that the asserted claims of U.S. Reissue Patent No. RE40,281 ("the RE'281 patent") are invalid under 35 U.S.C. Section 101 as being directed to unpatentable subject matter.  This Motion is supported by the following Memorandum of Points and Authorities, and the evidence on file in this action, including the supporting Declaration of Vinay V. Joshi and exhibits thereto, filed concurrently herewith.  A proposed order is attached hereto.

## STATEMENT OF RELIEF REQUESTED

Asus requests that the Court dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) and hold that the asserted claims of the RE'281 patent – claims 5, 6, 9-13, 15-22, 24-30, 32-35, 38-42, 45-49, 50, 51, 53, 55-61, 63, and 65-121 – are invalid under 35 U.S.C. section 101 because they are directed to unpatentable subject matter.

- 2 -

1

## **TABLE OF CONTENTS**

2

3

I.   INTRODUCTION ................................................................................................ 1

4

II.  STATEMENT OF ISSUES TO BE DECIDED ................................................ 2

5

III. FACTUAL BACKGROUND ............................................................................. 2

6

    A.   The Difference Between the Asserted Claims and the Admitted
    Prior Art is a Signal Processing Algorithm .......................................... 2

7

8

        1.   The Asserted Claims are directed to signal processing and
        more particularly to filtering data ........................................... 2

9

        2.   The filter banks of the prior art used two filters ..................... 4

10

        3.   The filter banks of the claimed invention use more than two
        filters ....................................................................................... 6

11

12

    B.   Issuance and Post-Issuance History of the RE'281 Patent ................. 10

13

IV.  LEGAL STANDARD ...................................................................................... 12

14

    A.   Rule 12(b)(6) Standards ...................................................................... 12

15

    B.   Section 101 Eligibility May Be Determined on a Motion to
    Dismiss ................................................................................................ 12

16

    C.   Patent Eligibility Under 35 U.S.C. Section 101 ................................. 13

17

V.   ARGUMENT .................................................................................................. 15

18

    A.   Alice Step One: the Asserted Claims are Directed to the Abstract
    Ideas of Splitting and Joining Data .................................................... 15

19

20

        1.   Independent method claims 5 and 18 .................................... 15

21

        2.   Other independent claims: method claims 26, 118, and 120;
        system claims 34, 41, 48, 57, 66, 71, 76 and 83; and storage
        media claims 90, 95, 100, 107, 114, and 116 ........................ 20

22

23

        3.   Dependent claims .................................................................. 21

24

    B.   Alice Step Two: the Asserted Claims Are Directed To An Abstract
    Idea Applied With General Purpose Computers And Fail To Recite
    An Inventive Concept Sufficient To Transform The Claims Into
    Patent-Eligible Subject Matter ........................................................... 22

25

26

27

28

1

VI.    CONCLUSION ........................................................................................................... 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

**Cases**

*Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir.
2016) ................................................................................... 14, 16, 18, 23

*Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014) ............................ 1, 13, 14

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .......................................................................... 12

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F..3d
1266, 1273-74 (Fed. Cir. 2012) ........................................................................ 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) .............................................. 12

*Bilski v. Kappos*, 561 U.S. 593 (2010) ..................................................................... 15

*Cogent Medicine, Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058 (N.D. Cal. 2014)............. 13, 18, 20, 24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n*,
776 F.3d 1343, 1346 (Fed. Cir. 2014) ................................................... 12, 20, 23

*Digitech Image Technologies, LLC v. Electronics For Imaging, Inc.*, 758 F.3d
1344, 1351 (Fed. Cir. 2014) ............................................................................ 18

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016)............................ 14, 17, 18

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, 137 F. Supp. 3d 1157
(N.D. Cal. 2015)......................................................................................... 13, 24

*Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ........................................................... 13, 19

*In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc) ............................................... 15

*In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ................................ 14

*Internet Patents Corp. v. General Automobile Ins. Servs., Inc.*, 29 F. Supp. 3d
1264 (N.D. Cal. 2013)..................................................................................... 13, 24

*IPLearn-Focus, LLC v. Microsoft Corp.*, Case No. 14-cv-00151-JD, Dkt. No. 144
at 5 (N.D. Cal. July 10, 2015) ...................................................................... 13, 24

*Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012) ............. 1, 13, 14

*OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) ................................ 12

*Open Text, S.A. v. Alfresco Software Ltd.*, Case No. 13-cv-04843-JD, Dkt. No.
204  at 5 (N.D. Cal. Sept. 19, 2014)......................................................... 13, 23, 24

*OpenText, S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1046 (N.D. Cal. 2015) .............................. passim

*OpenTV, Inc. v. Apple, Inc.*, Case No. 14-cv-01622-HSG, Dkt. No. 142, (N.D. Cal. Apr. 6, 2015) .................................................................................... 13, 20, 24

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1079 (N.D. Cal. 2016) ....................................................................................... 12, 17

*PurePredictive, Inc. v. H2O.AI, Inc.*, Case No. 17-cv-03049-WHO, Dkt. No. 31 (N.D. Cal. Aug. 29, 2017) ......................................................................... 13, 19

*RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855. F.3d 1322, 1326 (Fed. Cir. 2017) ............. 12, 14, 19

*TriDim Innovations LLC v. Amazon.com, Inc.* 207 F. Supp. 3d 1073, 1077 (N.D. Cal. 2016) ........................................................................................... passim

*Turner v. City & County of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) ........................ 12

*Ultramercial, Inc. v. Hulu,* LLC, 772 F.3d 709, 715 (Fed. Cir. 2014) ........................ 14, 15, 22, 24

**Statutes**

35 U.S.C. section 311(b) ................................................................................................ 11

**Regulations**

37 C.F.R. 1.552 ............................................................................................................ 11

**Other Authorities**

Manual of Patent Examining Procedure, 8th ed., Rev. 6 (Sept. 2007) ........................................... 11

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2      Asus submits this memorandum of points and authorities in support of its Rule 12(b)(6)

3 motion to dismiss the Complaint on the grounds that the asserted claims of U.S. Reissue Patent No.

4 RE40,281 ("the RE'281 patent") – claims 5, 6, 9-13, 15-22, 24-30, 32-35, 38-42, 45-49, 50, 51, 53,

5 55-61, 63, and 65-121 ("Asserted Claims") – are invalid under 35 U.S.C. Section 101 as being

6 directed to unpatentable subject matter.[1]

7 **I.      INTRODUCTION**

8      The Asserted Claims of the RE'281 patent are invalid under the two step analysis set forth in

9 *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014) and *Mayo Collaborative*

10 *Servs. v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).  The RE'281 patent predates both

11 *Alice* and *Mayo* and the USPTO would have rejected it if it were examined under the legal standard

12 set by those cases.  Because the Asserted Claims are directed to abstract ideas with no inventive

13 concept that would transform the abstract ideas into a patent-eligible invention, they fail to qualify

14 as statutory subject matter under 35 U.S.C. Section 101.

15      Under step one of the *Alice* analysis, the Asserted Claims are directed to an array of filter

16 banks that either split data or combine data.  Rather than operating in an unconventional way or

17 generating unique structures, the difference between the filter banks of the prior art and the filter

18 banks of the Asserted Claims merely amounts to a change in mathematical algorithms for

19 converting data from one form to another.  That much is admitted in the specification of RE'281

20 patent.  Notably, the Asserted Claims are similar to algorithms found not to be patent-eligible in

21 other cases.  Finally, the Asserted Claims amount to computer-implemented versions of human

22 activities.  The Asserted Claims are therefore directed to abstract ideas, and are unpatentable.

23      Under step two of the *Alice* analysis, the Asserted Claims fail because they singularly claim

24 abstract ideas and lack the inventive concept that would transform them into patent-eligible subject

25 matter.  The Asserted Claims, when viewed as ordered combinations or as individual elements,

26

27 ────────────────

[1] Generally, the infringement allegations of the Complaint (Dkt. No. 1) are directed to MP3, a
   collection of audio encoding and decoding standards.

28

recite mathematical operations untied to any non-generic or unconventional computing apparatus. Instead, as the specification of the RE'281 patent admits, the claimed inventions of the Asserted Claims are implemented on general purpose computers. The RE'281 patent specification is replete with references to general purpose computers, trumpeting the notion that such implementation is an advantage over the prior art. The Asserted Claims further raise a risk of preempting the use of the abstract ideas recited therein. Finally, the machine-or-transformation test confirms the lack of inventive concept; again, the Asserted Claims are not tied to a particular machine or apparatus, and do not involve the transformation of a physical article to a different state or thing.

For at least the foregoing reasons, and as discussed further below, Asus respectfully requests that the Court find the Asserted Claims invalid under 35 U.S.C. Section 101 and dismiss this action with prejudice pursuant to Rule 12(b)(6).

## II.      STATEMENT OF ISSUES TO BE DECIDED

Whether the Asserted Claims are invalid under 35 U.S.C. Section 101 as being directed to unpatentable subject matter.

## III.     FACTUAL BACKGROUND[2]

### A.      The Difference Between the Asserted Claims and the Admitted Prior Art is a Signal Processing Algorithm

#### 1.      The Asserted Claims are directed to signal processing and more particularly to filtering data

The 92 Asserted Claims relate to signal processing, in the context of compressing and decompressing data. *See* Complaint Exh. 1 (RE'281 patent) at col. 5, ll. 58-61 ("The present invention comprises audio compression and decompression systems. An audio compression system according to the present invention converts an audio signal into a series of sets of frequency components"); col. 6, ll. 15-18 ("A decompression system according to the present invention regenerates a time-domain audio signal from the sets of frequency components such as those generated by a compression system according to the present invention."). Generally, the encoding

---

[2] For purposes of this motion to dismiss, the factual allegations in the Complaint are accepted as true. Asus reserves its right to dispute the validity of Hybrid Audio's factual and legal positions during the course of this action.

process entails: 1) splitting an input signal in a filter bank into multiple subbands; 2) processing each subband in a quantizer; and 3) combining the quantized data and encoding it in an encoder, resulting in a compressed signal.  *See* RE'281 patent at Fig. 4 (prior art compression system).  The decoding process is essentially the reverse process, outputting in a decompressed signal.  The compression and decompression process may be implemented in software.[3]

Independent claims 5 and 18 are representative of the claims of the RE'281 patent. Independent method claim 5 is directed to the compression process, splitting the signal into multiple bands (or subbands):

A signal processing method comprising:

splitting a signal into subbands using a plurality of filter banks connected to form a tree-structured array having a root node and <u>greater than two leaf nodes</u>, each node comprising one filter bank having <u>greater than two filters</u>, and at least <u>one of the leaf nodes having a number of filters that differs from the number of filters in a second leaf node</u>.

Independent method claim 18 is directed to the inverse process, synthesizing one signal from multiple bands during the decompression process:

A signal processing method comprising:

synthesizing a signal using a plurality of synthesis filter banks connected to form a tree-structured array having <u>greater than two leaves</u> and a root node,

wherein each of the nodes comprises one synthesis filter bank having <u>greater than two filters</u>, with at least <u>one of the leaf nodes having a number of filters that differs from the number of filters in a second leaf node</u>.

The claim language that is not underlined is disclosed in the admitted prior art of the RE'281 patent specification, and particularly in the description of Figure 4.  The underlined language is what the patentee contends to be an improvement over the prior art.  The other independent claims – method claims 26, 118, and 120; system claims 34, 41, 48, 57, 66, 71, 76 and 83; and storage media claims 90, 95, 100, 107, 114, and 116 – share the same concept, namely:

---

[3] Hybrid Audio has accused certain Asus products of infringing the RE'281 patent in view of their compatibility with the MP3 Standards.  (Complaint ¶ 24.)  In lieu of identifying any discrete components in those products, Hybrid Audio relies on the MP3 Standards to support the infringement allegations.  *See, e.g.,* Complaint ¶ 35 (allegations re claim 5).

- 3 -

-   two levels of filter banks (the upper level recited as a "root node" and the lower level recited as "leaf nodes" in the claims);

-   more than two filter banks ("leaf nodes") in the lower level;

-   each lower level filter bank having more than two filters; and

-   one lower level filter bank having a number of filters different from another filter bank.

The difference between a tree-structured array of the prior art and claim 5, as discussed further below, is illustrated as follows (prior art on the left, claim 5 on the right):[4]



2.      The filter banks of the prior art used two filters

The prior art utilized analysis and synthesis filter banks[5] based on QMF filters, in a tree-structured array.  (RE'281 patent at col. 4, ll. 13-21.)  However, the QMF filter banks in prior art systems divided an input signal into only two bands.  (RE'281 patent at col 4, ll. 13-17; col. 4, ll. 39-41).    Accordingly, a large number of filter bank levels were required, resulting in an unacceptable number of aliasing artifacts.  (RE'281 patent at col. 4, ll. 33-41.)  That is, each level

[4] This figure is provided for purposes of illustration only.

[5] A filter bank used in the compression process is also referred to as an "analysis filter bank".  *See, e.g.*, RE'281 patent at Fig. 9.  A filter bank used in the decompression process is also referred to as a "synthesis filter bank" or "synthesizer".  *See, e.g.,* RE'281 patent at col 16, ll. 1-3; col. 16, ll. 10-14.

- 4 -

consisted of two filter banks for each filter bank in the previous level, with each filter bank having two filters.  The aliasing artifacts with QMF filter banks "become significant when the number of levels exceeds 4."  (RE'281 patent at col. 11, ll. 29-41.)

The QMF filter banks in a prior art audio compression system are incorporated into a sub-band analysis filter bank, as illustrated by block 12 in Figure 4 of the RE'281 patent, reproduced below:



FIGURE 4
(PRIOR ART)

The prior art systems process frequency bands of equal, or uniform, width.  (RE'281 patent at col. 3, ll. 43-44; col. 9, ll. 52-55; col 12, ll. 1-3.)  Subsequent quantization introduces noise with respect to each band.  (RE'281 patent at col. 10, ll. 5-6.)  In prior art systems, the quantization results in abrupt changes in the noise level across the frequency spectrum, which may be objectionable to a human listener.  (RE'281 patent  at col. 11, ll. 58-61; col. 12, ll. 3-5.)

Moreover, in contrast to the claimed invention of the RE'281 patent,  prior art compression systems required specialized equipment:

> Computer based audio and video systems have been limited to the use of costly outboard equipment such as an analog laser disc player for playback of audio and video.  This has limited the usefulness and applicability of such systems.  With such systems it is necessary to provide a user with a highly specialized playback configuration, and there is no possibility of distributing the media electronically.  However, personal computer based systems using

- 5 -

compressed audio and video data promise to provide inexpensive playback solutions and allow distribution of program material on digital disks or over a computer network.

Until recently the use of high quality audio on computer platforms has been limited due to the enormous data rate required [for] tier storage and playback. Quality has been compromised in order to store the audio data conveniently on disk. Although some increase in performance and some reduction in bandwidth has been gained using conventional audio compression methods, these improvements have not been sufficient to allow playback of high fidelity recordings on the commonly used computer platforms without the addition of expensive special purpose hardware.

(RE'281 patent at col. 4, ln. 53-col. 5, ln. 6.)

### 3.    The filter banks of the claimed invention use more than two filters

The claimed invention utilizes a "tree-structured array" of filter banks to process an incoming audio signal.  (RE'281 patent at col. 5, ll. 64-66.).  The claimed invention differs from the prior art in using two levels of filter banks, with the lower level (recited as "leaf nodes" in the claims) having more than two filter banks, and one lower level filter bank having a different number of filters from another lower level filter bank.  (RE'281 patent at col 11, ll. 25-29.)  The use of unequal width, or non-uniform, frequency bands results in a more gradual change in the noise level in high and mid-level bands, "thus giving less perceptible distortion at higher frequencies." (RE'281 patent at col 12, ll. 7-8.)

Figure 5 of the RE'281 patent, reproduced below, illustrates an embodiment of the claimed invention, in the context of signal compression:

//
//

- 6 -

1
2
3
4
5
6
7
8
9
10
11
12



FIGURE 5

13    An input signal is processed by a first level filter bank 31, which divides the signal data into

14 eight sub-bands of equal size. (RE'281 patent at col. 11, ll. 32-33). The input signal is digital, but

15 an analog input signal may be converted into digital format by an analog-to-digital converter.

16 (RE'281 patent at col. 9, ll. 55-58.)   The three lowest frequency bands are further processed by a

17 second level of filter banks 32, 33, and 34. (RE'281 patent at col. 9, ll. 9-11; col 11, ll.33-36. Filter

18 bank 32 divides its incoming sub-bands into eight sub-bands $S_1$-$S_8$. (RE'281 patent at col. 11, ll.

19 36-38.) Filter bank 33 and 34 each divide their incoming sub-bands into four sub-bands.[6] (RE'281

20 patent at col. 11, ll. 38-40.) Processing through both levels of filter banks result in 21 frequency

21 bands. (RE'281 patent at col. 11, ll. 40-41.). The 21 sub-bands are of unequal width, or segment

22 length. (RE'281 patent at col. 10, ll.65-66; col. 11, ll. 3-4.) The lowest frequency sub-bands, bands

23 1-8, have the finest frequency resolution, but the lowest temporal resolution. (RE'281 patent at col.

24 11, ll. 44-46.) The highest frequency sub-bands, bands 17-21, have the lowest frequency resolution,

25

26 [6] It should be noted that Figure 2, also includes a filter bank 32, which divides a sub-band into five
27    sub-bands, and filter banks 33 and 34 each divides a sub-band into four sub-bands, resulting in
      22 total frequency bands. (RE'281 patent at col. 9, ll. 15-19.) The difference in description is
28    not germane for purposes of this motion.

- 7 -

1  but the highest temporal resolution.  (RE'281 patent at col. 11, ll. 46-48.)  The 21 sub-bands (or

2  filtered outputs) are quantized by a quantizer, and then assembled into a compressed signal by an

3  encoder.  (RE'281 patent at col. 15, ll. 30-34; Fig. 9)

4       The RE'281 patent discloses that the filter banks of the claimed invention can be used in

5  place of the corresponding filter banks (based on QMF filters) in the prior art:

6       In one embodiment of the present invention, a tree structured decomposition which
        approximates the ear's time and frequency sensitivity is utilized.   This filter may be used to
7       replace sub-band analysis filter bank 12 [in the prior art system] shown in FIG. 4.

8  (RE'281 patent at col 11, ll. 17-20.)

9       The compressed signal is processed through an inverse of the coding process to reconstruct

10  an audio signal, as illustrated in Figure 10, reproduced below:

11

12

13

14

15

16

17

18

19

20

21

22



23       The compressed signal is processed by decoder 412 and then by dequantizer 414, resulting

24  in filtered samples $S_1$-$S_{21}$, corresponding to 21 frequency bands.  (RE'281 patent at col. 15, ll. 52-

25  59.)  The filtered samples are then input into an inverse sub-band filter 426, which consists of two

26  levels of inverse filter banks (also referred to as "synthesizers" or "synthesis filter banks")).

27  (RE'281 patent at col 16, ll. 1-3; col. 16, ll. 10-14.)  Several of the filtered samples are processed

28  - 8 -

through lower level inverse sub-band filter banks (or synthesizers) 427, 428, and 429, and then through synthesizer 430.  (RE'281 patent at col 16, ll 1-29.)  Four filtered samples are input into each of synthesizers 427 and 428, and eight filtered samples are input into synthesizer 429. (RE'281 patent at col. 16, ll. 19-25.)  Each synthesizer 427, 428, and 429 has a single output, which serves as an input into synthesizer 430.  (RE'281 patent at col. 16, ll. 26-29.)  The remaining filtered samples are passed directly to synthesizer 430, which then generates a decompressed signal that is a reconstructed, close approximation of the original input signal.  (RE'281 patent at col. 16, ll. 1-3.) The use of two levels of filter banks reduces the computational workload by substantially reducing the number of required mathematical operations (multiplies and adds).  (RE'281 patent at col 14, ll. 2-12.)

The RE'281 patent discloses that like the claimed invention, "[p]rior art systems also utilize filter banks," but unlike the claimed invention "the frequency bands are uniform in size."  (RE'281 patent at col. 3, ll. 43-44.)  In the claimed invention, the signal may be divided into "sub-bands of distinct (nonuniform) bandwidths by means of a single nonuniform filter bank transform."  (RE'281 patent at col 21, ll. 63-65.)  This method is an alternative implementation of filters that may be implemented as "finite impulse response filters with real filter coefficients."  (RE'281 patent at col. 21, ll. 49-51.)  Generation of finite impulse response filter bank waveforms through nonuniform filter banks are known in the art.  (RE'281 patent at col 22, ll. 61-67 (citing article).)

The RE'281 patent teaches that a set of frequency components may be generated from shift samples through a shift register.  (RE'281 patent at col. 12, ln. 66-col. 13, ln. 3.)  The contents of the shift register are used to generate polyphase components by a windowing (multiplication) operation.  (RE'281 patent at col. 13, ll. 4-29.)  The frequency components are then generated by subjecting the polyphase components to a matrix multiplication operation.  (RE'281 patent at col. 13, ll. 30-38; *see also id.* at col. 13, ll. 39-41 ("This operation is equivalent to passing the polyphase components through M finite impulse response filters of length 2M.").  The computational workload – here, the number of mathematical multiply and add operations – is proportional to the number (W) of sample values used and the number (M) of frequency components to be generated.

- 9 -

(RE'281 patent at col. 13, ll. 56-63 (computational workload is $(W + 2M^2)$ multiplies and adds).)
The two level filter banks of the claimed invention not only generate a non-uniform band structure,
but also reduce the number of mathematical operations required for manipulating data.  (RE'281
patent at col. 13, ln. 63-col. 14, ln. 14.)

Compared to the prior art, the claimed invention of the RE'281 may be implemented on
general purpose computers (emphasis added below):

> In practice, the synthesis and analysis filter banks are implemented on digital computers
> which may be <u>general purpose computers</u> or special computers designed to more efficiently
> carry out the operations.
> (RE'281 patent at col. 3, ll. 2-5.)

> [T]he computational workload in analyzing and synthesizing audio tracks [is] of a great
> importance in providing systems that can operate on <u>general purpose computing platforms</u>.
> (RE'281 patent at col. 13, ll. 56-59.)

> While the above-described embodiments of synthesizers and sub-band analysis filters are
> described in terms of special purpose hardware for carrying out the various operations, it
> will be apparent to those skilled in the art that the entire operation may be carried out on a
> <u>general purpose digital computer</u>.
> (RE'281 patent at col. 17, ll. 13-18.)

> While audio decompression system 600 has been discussed in terms of individual
> computational elements, it will be apparent to those skilled in the art that the functions of
> decoder 602, de-quantizer 604, synthesizer 606, buffer 608 and controller 614 can be
> implemented on a <u>general purpose digital computer</u>.  In this case, the functions provided by
> clock 609 may be provided by the computer's clock circuitry.
> (RE'281 patent at col. 19, ll. 57-63.)

> However, there are situations in which the computational capacity of the compression
> platform may be limited.  This can occur when the computational platform has insufficient
> computing power, or in cases in which the platform performing the compression may also
> include a <u>general purpose computer</u> that is time-sharing its capacity among a plurality of
> tasks.  In the later [sic] case, the ability to trade-off computational workload against audio
> quality is particularly important.
> (RE'281 patent at col 20 ll. 51-59.)

The RE'281 also discloses that "such a filter bank [of the claimed invention] can be constructed
from analog circuit components"; however, as desired performance may be difficult to obtain with
analog components, a digital filter is preferred.  (RE'281 patent at col. 12, ll. 62-63.)

**B.      Issuance and Post-Issuance History of the RE'281 Patent**

The RE'281 patent is a reissue of United States Patent No. 6,252,909 ("the '909 patent"),
which issued June 26, 2001 from an application filed February 25,1997.  (Dkt. No. 1 at Exh. 1.)

- 10 -

1  The '909 patent, in turn, claims priority through a string of applications to an application filed

2  September 21, 1992. (*Id.*)  On November 23, 2004, three years after the '909 patent issued, Hybrid

3  Audio's predecessor-in-interest filed a reissue application that issued on April 29, 2008 as the

4  RE'281 patent. (RE'281 patent at 1; Complaint ¶ 11.)  The applicant made a number of changes,

5  adding a substantial amount of new material to the specification. (Exh. 1 to the Declaration of

6  Vinay V. Joshi in Support of Defendants' Motion to Dismiss ("Joshi Decl.") (Manual of Patent

7  Examining Procedure, 8th ed., Rev. 6 (Sept. 2007)) at section 1455 ("The specifications of reissue

8  patents will be printed in such a manner as to show the changes over the original patent text by

9  enclosing any material omitted by the reissue in heavy brackets [ ] and printing material added by

10  the reissue in *italics*."))  In addition, the applicant added a number of claims, including all of the

11  Asserted Claims, to the RE'281 patent. (RE'281 patent at col. 24, ln. 23-col. 32, ln. 10.)

12       While other litigation involving the RE'281 patent was pending, a reexamination request for

13  the RE'281 patent was filed on June 18, 2012, three months before the patent expired. (Dkt. No. 1

14  at Exh. 3, Complaint ¶ 15.)  The Patent and Trademark Office subsequently issued an *ex parte*

15  reexamination certificate confirming the patentability of the challenged claims. (Dkt. No. 1 at Exh.

16  3, Complaint ¶ 15.)  However, the Patent and Trademark Office did not review the patentability of

17  the RE'281 patent under 35 U.S.C. Section 101. *See* 37 C.F.R. 1.552 (*ex parte* reexamination

18  proceeding on basis of patents or printed publications, and 35 U.S.C. section 112 for subject matter

19  added or in proceeding).

20       After the Complaint was filed, Unified Patents, Inc. filed a petition for *inter partes* review

21  with the Patent Trial and Appeal Board ("PTAB") on June 27, 2016. (Joshi Decl. Exh. 2.)  The

22  petition alleged that the RE'281 patent was invalid in view of certain prior art. (*Id.*).  The PTAB

23  subsequently denied institution of *inter partes* review on January 3, 2017. (Joshi Decl. Exh. 3.)

24  However, the PTAB did not consider patentability under 35 U.S.C. Section 101. *See* 35 U.S.C.

25  section 311(b) (*inter partes* review petition is limited to patentability under sections 102 or 103 in

26  view of prior art patents or printed publications).

27

28

1

## IV.    LEGAL STANDARD

2

### A.    Rule 12(b)(6) Standards

3

A party may move to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules of

4

Civil Procedure, if the complaint fails to state a claim for which relief may be granted.  The

5

complaint must allege sufficient facts to state a claim for relief that is plausible on its face.  *Bell*

6

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In determining whether dismissal is

7

warranted, the allegations of material fact in the complaint are taken as true, and construed in the

8

light most favorable to the nonmoving party.  *Turner v. City & County of San Francisco*, 788 F.3d

9

1206, 1210 (9th Cir. 2015); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank,*

10

*National Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014) (regional circuit law applies to motion to

11

dismiss).  However, legal conclusions are not accorded the same deference.  *See Ashcroft v. Iqbal*,

12

556 U.S. 662, 678 (2009) ("the tenet that a court must accept as true all of the allegations contained

13

in a complaint is inapplicable to legal conclusions").

14

### B.    Section 101 Eligibility May Be Determined on a Motion to Dismiss

15

"Patent eligibility under 35 U.S.C. § 101 is an issue of law."  *OIP Techs., Inc. v.*

16

*Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).  While the applicable burden of proof is

17

unclear, the determination of eligibility under 35 U.S.C. Section 101 may be made in the context of

18

a motion to dismiss.[7]  *Id.* at 1361 (affirming dismissal).

19

In deciding a motion to dismiss, this Court has recognized that "courts may find patents

20

invalid at the pleading stage and prior to formal claim construction."  *TriDim Innovations LLC v.*

21

*Amazon.com, Inc.* 207 F. Supp. 3d 1073, 1077 (N.D. Cal. 2016).  Even where the parties may

22

dispute the construction of claim terms, the Court may determine subject matter eligibility under 35

23

U.S.C. Section 101 if the dispute does not affect the eligibility determination.  *See IPLearn-Focus,*

24

25

26

27

28

---

[7] A court in this District has noted that "[n]o post-*Alice* decision of the U.S. Supreme Court or the Federal Circuit appears to directly address whether the clear and convincing standard applies in evaluating a lack of patent-eligible subject matter on the pleadings."  *Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1079 (N.D. Cal. 2016).  While the RE'281 patent is invalid under either standard, a clear and convincing standard appears incongruous for an issue of law subject to *de novo* review.  *See RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855. F.3d 1322, 1326 (Fed. Cir. 2017) ("We review § 101 patent eligibility determinations *de novo*.")

- 12 -

*LLC v. Microsoft Corp.*, Case No. 14-cv-00151-JD, Dkt. No. 144 at 5 (N.D. Cal. July 10, 2015) ("Claim construction is particularly unnecessary in this case because the basic character of the claimed subject matter is readily ascertainable from the face of the patent, and the parties' disputed constructions in no way affect the court's analysis.").   Accordingly, the Court may properly dispose of this action at the pleading stage. *Open Text, S.A. v. Alfresco Software Ltd.*, Case No. 13-cv-04843-JD, Dkt. No. 204 at 5 (N.D. Cal. Sept. 19, 2014) ("*Alfresco*") (citing *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F..3d 1266, 1273-74 (Fed. Cir. 2012)); *see also PurePredictive, Inc. v. H2O.AI, Inc.*, Case No. 17-cv-03049-WHO, Dkt. No. 31 (N.D. Cal. Aug. 29, 2017) (granting Rule 12(b)(6) motion to dismiss re Section 101 invalidity); *Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, 137 F. Supp. 3d 1157 (N.D. Cal. 2015) (same); *OpenTV, Inc. v. Apple, Inc.*, Case No. 14-cv-01622-HSG, Dkt. No. 142, (N.D. Cal. Apr. 6, 2015) (same); *Cogent Medicine, Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058 (N.D. Cal. 2014) (same); *Internet Patents Corp. v. General Automobile Ins. Servs., Inc.*, 29 F. Supp. 3d 1264 (N.D. Cal. 2013) (same).

### C.      Patent Eligibility Under 35 U.S.C. Section 101

35 U.S.C. Section 101 sets forth four classes of patent-eligible subject matter: "any new and useful process, machine, manufacture, or composition of matter".   However, long-standing exceptions to patentability under Section 101 are 1) laws of nature; 2) natural phenomena; and 3) abstract ideas. *Alice*, 134 S. Ct. at 2354.  The concern animating these exceptions from patentability is that a patentee may preempt use of "the basic tools of scientific and technological work", monopolization of which "might tend to impede innovation more than it would tend to promote it." *Mayo*, 566 U.S. at 70 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court in *Alice* has set forth a two-step analysis to determine whether a claimed invention is patentable under 35 U.S.C. Section 101.  First, the Court examines "whether the claims at issue are directed to a patent-ineligible concept."  134 S. Ct. at 2355.  At this step, the a detailed claim analysis is not necessary; instead, "the Court distills the gist of the claim". *OpenText, S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1046 (N.D. Cal. 2015) ("*Box*").  Where the claims relate to abstract ideas, the inquiry requires "look[ing] at the focus of the claimed advance over the prior art to

- 13 -

determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (internal quotations omitted). While there are no hard-and-fast rules for determining whether the claims are directed to ineligible subject matter, "both [the Federal Circuit] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).  For computing-related claims, the inquiry examines "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1336-37.

The second step of the *Alice* analysis is whether the claims contain an inventive concept sufficient to transform an abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355 ("To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application") (quoting *Mayo*, 566 U.S. at 78). The claim must include "additional features" that go beyond "well-understood, routine, conventional activity." *Ultramercial, Inc. v. Hulu,* LLC, 772 F.3d 709, 715 (Fed. Cir. 2014) (quoting *Mayo*, 566 U.S. at 82).  The implementation of an abstract idea on a computer, in and of itself, is not enough.  *Id.* ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.").  To be patentable under Section 101, "an inventive concept must be evident in the claims." *RecogniCorp*, 855 F.3d at 1327.  Not all computer-related claims are unpatentable; however, claims that can be implemented by a generic computer or conventional components are not patent-eligible. *Affinity Labs*, 838 F.3d at 1262.  "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016).  In other words, "[p]atent eligibility requires 'concrete improvements in the recited computer technology.'" *TriDim*, 207 F. Supp. 3d at 1078 (quoting *Enfish*, 822 F.3d at 1339).  While the machine-or-transformation test is no longer the sole test for Section 101 eligibility, the test provides "a useful

- 14 -

clue" to patent eligibility in the second step of the *Alice* analysis.  *Ultramercial*, 772 F.3d at 716. The test examines whether the claimed process 1) is tied to a particular machine or apparatus, or 2) transforms an article into a different state or thing.  *Id.* (citing *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), aff'd on other grounds, *Bilski v. Kappos*, 561 U.S. 593 (2010)).

## V.   ARGUMENT

The claims of the RE'281 patent are not patent-eligible under both steps of the *Alice* test. First, the claims are directed to abstract ideas: a mathematical operation to divide data into multiple portions, and in the inverse, a mathematical operation to join multiple data portions into a single piece of data.  Second, the claims are broadly generic, and do not contain any meaningful limitations to restrict the claims to a non-routine and specific application.  Instead, the inventors admitted that the claims are implementable by generic, non-specialized computers.  Accordingly, the Asserted Claims are not patent-eligible under 35 U.S.C. Section 101.

### A.   *Alice* Step One: the Asserted Claims are Directed to the Abstract Ideas of Splitting and Joining Data

#### 1.   Independent method claims 5 and 18

When properly examined, the focus of independent method claim 5 is the abstract idea of using a mathematical algorithm to split one piece of data in two.  Independent method claim 18 is directed to the inverse, the abstract idea of using a mathematical algorithm to combine several pieces of data into one.   *See Box*, 78 F. Supp. 3d at 1046 ("In evaluating the first prong of the *Mayo/Alice* test, which looks to see if the claim in question is directed at an abstract idea, the Court distills the gist of the claim").  The claims are mathematical operations that are part of the process of converting data between one form (uncompressed, decoded data format) and another (compressed, encoded data format).  Accordingly, the Asserted Claims fail to pass step one of the *Alice* analysis.

As an initial matter, the Asserted Claims are directed to mathematical concepts rather than physical structures.  The specification discloses that the analysis filter banks and synthesis filter banks used in the compression and decompression process, respectively, may be implemented on

general purpose computers.  *See, e.g.,* RE'281 patent at col. 17, ll. 13-18 ("While the above-described embodiments of synthesizers and sub-band analysis filters are described in terms of special purpose hardware for carrying out the various operations, it will be apparent to those skilled in the art that the entire operation may be carried out on a general purpose digital computer.").  The reference to general purpose computers in the specification, and the contrast with "special purpose hardware" evidence that the claimed invention is directed to a mathematical algorithm that may be implemented in software.  Moreover, one of the purported benefits of the claimed invention is a reduction in the number of required mathematical operations, such as multiplies and adds.  (RE'281 patent at col. 14, ll. 9-12.)  The RE'281 patent teaches that "the computational workload inherent in generating M frequency components from a window of W audio sample values is approximately (W + $2M^2$) multiplies and adds", that is, the number of multiply and add operations required for splitting an input signal into frequency sub-bands.  (RE'281 patent at col. 13, ll. 60-63.)  That the Asserted Claims are directed to algorithms is confirmed by the Complaint, which cites to documents relating to MP3 standards rather than the accused products.  *See* Complaint ¶¶ 33, 55 (infringement allegations relating to claims 5 and 18).

In view of the purported advances over the prior art, the Asserted Claims are properly distilled to an array of filter banks, *i.e.*, a mathematical algorithm.  *See Affinity Labs*, 838 F.3d at 1203 (first step is to "look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter").  The Asserted Claims boil down to the use of nonuniform filter banks with more than two filters, unlike the uniform filter banks of the prior art.  The RE'281 patent discloses that it is an improvement over filters utilizing prior art QMF filters, another type of mathematical algorithm.  The problem with using QMF filters is that the filter banks had only two filters, thus requiring a number of filter bank levels.  *See e.g.,* RE'281 patent at 21-24 ("That is, each of the outputs of the first level filter becomes the input to another filter bank at least one of whose two outputs is fed to yet another level, and so on.").  Another problem with prior art systems is that the filter banks utilized uniform frequency bands.  *See, e.g.,* RE'281 patent at col. 3, ll. 43-44 ("Prior art systems also utilize filter banks in which the

1    frequency bands are uniform in size.").  The RE'281 patent purports to solve these problems by

2    utilizing two levels of filter banks, in which 1) the lower level includes more than two filter banks,

3    2) each lower level filter bank has more than two filters, and 3) one lower level filter bank has a

4    number of filters different from another filter bank.  *See, e.g.,* RE'281 patent at Fig. 5; col. 11, ll.

5    32-53.  Indeed, the claimed invention could be utilized in a prior art compression system, leaving

6    the remaining algorithms – quantization and coding – undisturbed.  *See* RE'281 patent at col. 11, ll.

7    19-20 ("This filter may be used to replace sub-band analysis filter bank 12 show in FIG. 4.); *see*

8    *also* col. 10, ll. 2-4 (coding algorithms well known to those skilled in the art); col. 10, ll. 18-20 (goal

9    of quantization algorithm to minimize overall effect of quantization errors).  In view of the prior art,

10   method claims 5 and 18 thus are property viewed as being directed to mathematical algorithms for

11   splitting and combining data.

12          Method claims 5 and 18 are not directed to a specific improvement in computer capability or

13   operation.  As the Court has noted, "implementing an abstract idea on conventional computer

14   capability is not enough", but instead requires "concrete improvements in the recited computer

15   technology".  *TriDim*, 207 F. Supp. 3d at 1078 (quoting *Enfish*, 822 F.3d at 1339). The claims

16   should be examined at an appropriate level of abstraction, taking into account the language of the

17   claims.  *Papst*, 193 F. Supp. 3d at 1084.  Here, the analysis and synthesis filter banks of the claimed

18   invention are simply substitutes for a portion of the overall algorithms for data compression and

19   decompression, respectively.  *See* RE'281 patent at col. 11, ll. 19-20 (filter banks of prior art system

20   can be swapped for filter banks disclosed in specification).  While the claims provide that the lower

21   level filter banks have more than two filters and do not have a uniform number of filters, nothing in

22   the claims recites that the filter banks operate in an unconventional way or generate unique

23   structures.  In addition, the implementation is technology-agnostic; the claims may be implemented

24   either in software as a digital filter, or "constructed from analog circuit components."  (RE'281

25   patent at col. 12, ln. 62.)  Method claims 5 and 18 are appropriately viewed as directed to

26

27

28
                                                    - 17 -

mathematical operations for splitting and combining data, respectively.[8]  As a result, the RE'281 patent is different from the patent at issue in *Enfish*, in which the claims required the creation and manipulation of an unconventional data structure in a computing environment.  822 F.3d at 1337 ("Here, the claims are not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database.") (emphasis in original).

Instead, claims 5 and 18 are similar to claims held as abstract in other cases, which involved the combination or conversion of data.  The method claim at issue in *Digitech Image Technologies, LLC v. Electronics For Imaging, Inc.* was directed to a method of combining data to generate a device profile, in the context of digital imaging.  758 F.3d 1344, 1351 (Fed. Cir. 2014).  The Federal Circuit held that the claim was directed to an abstract idea "of organizing information through mathematical correlations and is not tied to a specific structure or machine."  *Id.* at 1350.  Simply combining data sets through a mathematical algorithm was insufficient:

> The above claim recites a process of taking two data sets and combining them into a single data set, the device profile.  The two data sets are generated by taking existing information – *i.e.*, measured chromatic stimuli, and device response characteristic functions – and organizing this information into a new form. . . . Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.

*Id.* at 1351.  Likewise, method claim 18 is a process that employs mathematical algorithms to manipulate existing information to generate additional information, *i.e.*, a process of "synthesizing a signal" by combining multiple pieces of data.  *See* RE'281 patent at col. 16, ll. 1-3 ("The filtered samples are inputted to an inverse sub-band filter 426 which generates an approximation to the original audio signal from the filtered signal values.").  Method claim 5 is the inverse, reciting "splitting a signal into subbands".  Comparison of the Asserted Claims with the one at issue in *Digitech* buttresses the conclusion that the claims are directed to an abstract idea.  *See Enfish*, 822 F.3d at 1334 (sufficient to compare claims at issue to those in other cases to assess eligibility under Section 101).

---

[8] That claims 5 and 18 are purportedly directed to "signal processing" does not save the claims, as "merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract."  *Affinity Labs*, 838 F.3d at 1259; *see also Cogent*, 70 F. Supp. 3d at 1065 ("A field of use limitation . . . still allows the patentee to preempt use of the abstract idea in the entire field.").

1          Similarly, in *RecogniCorp*, the claim at issue was directed to encoding and decoding image

2    data.  855 F.3d at 1379.  The claim recited a user displaying images on a first display, assigning

3    image codes to the images using a mathematical formula and reproducing the image based on the

4    codes.  *Id.* at 1379-80.  "This method reflects standard encoding and decoding, an abstract concept

5    long used to transmit information."  *Id.* at 1380.  The Court held that the claim was directed to an

6    abstract idea "whereby a user starts with data, codes that data using 'at least one  multiplication

7    operation', and ends with a new form of data."  *Id.* at 1327.  Here, both method claims 5 and 18 of

8    the RE'281 patent involve manipulating data through mathematical operations, resulting in a new

9    form of data.   Again, the similarities between claims 5 and 18 and the claims at issue in

10   *RecogniCorp* support a similar conclusion, that the claims are directed to abstract ideas.  *See also*

11   *Benson*, 409 U.S. at 65 (algorithm "to convert signals from binary-coded decimal form into pure

12   binary form" as abstract idea).

13         Finally, method claims 5 and 18 are directed to activity that can be performed without a

14   computer.  The claims involve the splitting and combination of data, which can be done without a

15   computer.  For example, without a computer, a person can separate a book into multiple pieces

16   (claim 5) and recombine the pieces to reconstruct the original book (claim 18.)  Claims 5 and 18 are

17   thus directed to methods or organizing human activity, and are unpatentable abstract ideas.  *See*

18   *Box*, 78 F. Supp. 3d at 1047 (claim for collaborative workspace amounted to "a method for

19   organizing human activity"); *see also PurePredictive, Inc. v. H2O.AI, Inc.*, Case No. 17-cv-03049-

20   WHO, Dkt. No. 31 at 8 (mathematical algorithms to perform predictive analytics; "While PPI

21   claims that this shows it would be impossible for a human to perform such a task, just because a

22   computer can make calculations more quickly than a human does not render a method patent

23   eligible"); *TriDim*, 207 F. Supp. 3d at 1079 (patents "represent nothing more than the abstract idea

24   of placing more frequently used documents in a space that is more easily accessible – an

25   organizational system people intuitively used in a variety of contexts").  Thus, claims 5 and 18 are

26   directed to abstract ideas, and do not qualify for patent eligibility under step one of the *Alice*

27   analysis.

28

1

2

### 2. Other independent claims: method claims 26, 118, and 120; system claims 34, 41, 48, 57, 66, 71, 76 and 83; and storage media claims 90, 95, 100, 107, 114, and 116

3    While claims 5 and 18 are representative, and suffice for purposes of this motion, Asus

4  addresses the remaining independent claims briefly. *See Box,* 78 F. Supp. 3d at 1045 (claim 1 as

5  representative; citing *Content Extraction*, 776 F.3d 1343).  All of the claims are identical to method

6  claims 5 and 18 for purposes of the Section 101 analysis, as they do not recite any additional non-

7  conventional or non-generic components or processes.   Accordingly, these claims are also directed

8  to abstract ideas.  *See Cogent*, 70 F. Supp. 3d at 1066 (where system and computer component

9  claims add nothing beyond general computer comments, claims "rise and fall with the method

10 claims"); *OpenTV*, Case No. 14-cv-01622-HSG, Dkt. No. 142 at 11 (system claims subject to same

11 analysis as method claims where recited components were "purely functional and generic").

12    Method claims 26, 118, and 120 are directed to methods of signal processing or

13 reconstructing a signal, utilizing a tree-structured array of synthesis filter banks.  The arrangement

14 of synthesis filter banks is substantially the same as in method claim 18, adding that the outputs of

15 the lower level are inputs to the upper level.

16    System claims 34 and 41 are directed to a signal processing system comprising a plurality of

17 filter banks that split a signal into subbands.  The arrangement of the filter banks is substantially the

18 same as recited in method claim 5, and do not recite other structures beyond the tree-structured

19 array of filter banks.

20    System claims 48 and 57 are directed to a signal processing system comprising a plurality of

21 synthesis filter banks that synthesize a signal.  The arrangement of the synthesis filter banks is

22 substantially the same as recited in method claim 18, and do not recite other structures beyond the

23 tree-structured array of synthesis filter banks.

24    System claims 66 and 71 are directed to a signal processing system comprising "means for

25 splitting a signal" into sub-bands using a plurality of filter banks.  The arrangement of the filter

26 banks is substantially the same as recited in method claim 5, and do not recite other structures

27 beyond the tree-structured array of filter banks.

28

- 20 -

1  System claims 76 and 83 are directed to a signal processing system comprising "means for

2 synthesizing a signal" using a plurality of synthesis filter banks.  The arrangement of the synthesis

3 filter banks is substantially the same as recited in method claim 18, and do not recite other

4 structures beyond the tree-structured array of synthesis filter banks.

5  Information storage media claims 90 and 95 are directed to storage media that, when

6 executed, splits a signal into sub-bands using a plurality of filter banks.  The arrangement of the

7 filter banks is substantially the same as recited in method claim 5, and do not recite other structures

8 beyond the tree-structured array of filter banks.

9  Information storage media claims 100 and 107 are directed to storage media that, when

10 executed, synthesizes a signal using a plurality of synthesis filter banks.  The arrangement of the

11 synthesis filter banks is substantially the same as recited in method claim 18, and do not recite other

12 structures beyond the tree-structured array of synthesis filter banks.

13  Information storage media claims 114 and 116 are directed to storage media that have stored

14 thereon audio information having been split into sub-bands by a plurality of filter banks.  The

15 arrangement of the filter banks is substantially the same as recited in method claim 5, and do not

16 recite other structures beyond the tree-structured array of filter banks.

17  None of the other independent claims alter the conclusion that the claimed inventions are

18 directed to the abstract ideas of splitting and combining data.

19  **3.  Dependent claims**

20  The dependent claims fall with method claims 5 and 18.  The dependent claims, with one

21 exception, are directed to the characteristics and operation of the tree-structured array of filter banks

22 (or synthesis filter banks).  *See, e.g.*, RE'281 patent at claim 6 ("The method of claim 5, wherein at

23 least one of the filter banks is designed to utilize cosine modulation.").  The only dependent claims

24 which add additional components recite a modulator.  (RE'281 patent at claims 54, 64.)  The

25 modulator is an algorithmic entity that incorporates the filter banks.  *See* RE'281 patent at col 5, ll.

26 49-53 ("In one embodiment, the modulator includes a tree-structured array of filter banks having M

27 leaf nodes, each of the values related to the symbols forming an input to a corresponding one of the

28

leaf nodes.").  Accordingly, the analysis under step one of *Alice* is identical to claims 5 and 18, and, like claims 5 and 18, the dependent claims are directed to abstract ideas.

**B.** ***Alice* Step Two: the Asserted Claims Are Directed To An Abstract Idea Applied With General Purpose Computers And Fail To Recite An Inventive Concept Sufficient To Transform The Claims Into Patent-Eligible Subject Matter**

The Asserted Claims, when viewed as individual elements or as an ordered combination, do not include additional features that transform the claimed abstract ideas into patent-eligible subject matter.  Each of the elements of method claims 5 and 8 is set forth below:

| Claim 5 | Claim 18 |
| --- | --- |
| A signal processing method comprising: | A signal processing method comprising: |
| splitting a signal into subbands using a plurality of filter banks | Synthesizing a signal using a plurality of synthesis filter banks |
| connected to form a tree-structured array having a root node and greater than two leaf nodes, | connected to form a tree-structured array having greater than two leaf nodes and a root node, |
| each node comprising one filter bank having greater than two filters, | wherein each of the nodes comprises one synthesis filter bank having greater than two filters, |
| and at least one of the leaf nodes having a number of filters that differs from the number of filters in a second leaf node. | with at least one of the leaf nodes having a number of filters that differs from the number of filters in a second leaf node. |

The claims, when viewed as ordered combinations or as individual elements, recite mathematical operations without any further concrete additions that would narrow the claims beyond the abstract ideas themselves.  The only difference between the recited filter banks and the QMF filter banks in the prior art is that the QMF filter banks – a mathematical algorithm – provided for only two filters. (RE'281 patent at col 4, ll. 33-40.)  That difference in mathematical operation is insufficient to confer patent eligibility.  *See Ultramercial*, 772 F.3d at 715 ("Although certain additional

- 22 -

limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea of showing an advertisement before delivering free content.").

Confirming the lack of inventive concept is the patentee's admission that the claimed invention are to be implemented on generic, conventional computer components.  In step two of the *Alice* analysis, "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful . . . , it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"  *Content Extraction*, 776 F.3d at 1347-48 (quoting *Alice*, 134 S. Ct. at 2359).  The RE'281 patent discloses that a disadvantage of the prior art was the requirement for specialized equipment.  (RE'281 patent at col. 4, ln. 53-col. 5, ln.6.)  The patent makes explicit multiple references to "general purpose" computers or computing platforms in explaining embodiments within the scope of the claimed invention.  *See, e.g.,* RE'281 patent at col. 3, ll. 2-5 ("In practice, the synthesis [for decompression] and analysis [for compression] filter banks are implemented on digital computers which may be general purpose computers or special computers designed to more efficiently carry out the operations.").  Similarly, the independent non-method claims refer only to generic computing products: "a signal processing system" (claims 34, 41, 48, 57, 66, 71, 76, 83), and 'information storage media" (claims 90, 95, 100, 107, 114, 116). The reference to generic computing components is insufficient to meet the inventive concept requirement.  *See Affinity Labs*, 838 F.3d at 1262 (no inventive concept where claims recited generic features to implement abstract idea); *TriDim*, 207 F. Supp. 3d at 1080 (patents "'specifically intended to be used with a typical computer'"); *Alfresco*, Case No. 13-cv-04843, Dkt. No. 204 at 8 ("The asserted claims in both patents implement the basic marketing scheme on a generic computer system without any meaningful limitations.").  Accordingly, the Asserted Claims are not patent-eligible under step two of the *Alice* analysis.

Moreover, the Asserted Claims raise a risk of preemption with respect to the use of an abstract idea.  As disclosed in the RE'281 patent, multi-level filter banks, with each filter bank having multiple filters, as known in the prior art, with QMF filter banks being limited to two filters.

- 23 -

( RE'281 patent at Fig. 4; col. 4, ll. 13-21.)  The Asserted Claims would preempt the use of lower level filter banks with non-uniform filter banks (*i.e.*, having a non-uniform number of filters), with more than two filters.  Limitation of the claims to the field of "signal processing" is  insufficient to avoid these preemption concerns.  *Box*, 78 F. Supp. 3d at 1049; *Cogent*, 70 F. Supp. 3d at 1065; *Alfresco*, Case No. 13-cv-04843-JD, Dkt. No. 204 at 8.  Such preemption further confirm the lack of an inventive concept for the Asserted Claims.  *TriDim*, 207 F.3d at 1081; *IPLearn-Focus*, Case No. 14-cv-00151-JD, Dkt. No. 144 at 10-11 ("The fact that the patents describe a wide variety of alternative configurations only underscores their potential to preempt virtually all practical implementations of the concept.").

Finally, the lack of an inventive concept is confirmed by the machine-or-transformation test. The Asserted Claims are not tied to a particular machine or apparatus.  *See Evolutionary Intelligence*, 137 F. Supp. 3d at 1169 (claimed methods not tied to any particular machine).  Nor do the Asserted Claims involve the transformation of a physical article to a different state or thing. Instead, the RE'281 patent explicitly discloses implementation of the Asserted Claims on general purpose computers.  *See, e.g.,* RE'281 patent at col. 17, ll. 13-18.  Accordingly, the filter banks of the Asserted Claims are unpatentable.  *See Ultramercial*, 772 F.3d at 716-17 ("The claims . . . are not tied to any particular novel machine or apparatus, only a general purpose computer. . . . Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis."); *OpenTV*, Case No. 14-cv-01622-HSG, Dkt. No. 142 at 9; *Internet Patents*, 29 F. Supp. 3d at 1269.

## VI.    CONCLUSION

Because the Asserted Claims are directed to the abstract ideas of splitting and joining data, which can be easily implemented by general purpose computers, the claims are not patent-eligible pursuant to 35 U.S.C. Section 101.  Defendants therefore respectfully request that the Court dismiss this action with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

///
///

Dated:  January 4, 2018                                     Respectfully submitted,


                                                           */s/ Vinay V. Joshi*
                                                           Vinay V. Joshi
                                                           vjoshi@thepatentattorneys.com
                                                           Anthony S. Kim
                                                           akim@thepatentattorneys.com
                                                           Amin Turocy & Watson LLP
                                                           160 West Santa Clara Street
                                                           Suite 975
                                                           San Jose CA 95113
                                                           Telephone: (650) 618-6481
                                                           Facsimile:  (216) 696-8731

                                                           ***Attorneys for Defendants***
                                                           ***ASUS Computer International and ASUSTeK***
                                                           ***Computer Inc.***

- 25 -

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3

    I hereby certify that counsel of record who are deemed to have consented to electronic

4

service are being served on this 4th day of January, 2018, with a copy of this email via the Court's

5

CM/ECF system per Local Rule CV-5-1(h)(1).

6

7

                                      */s/ Vinay V. Joshi*         
                                        Vinay V. Joshi

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28